NATIONAL BANK OF WILMINGTON AND BRANDYWINE,

*vs.*

WILMINGTON, NEW CASTLE AND SOUTHERN RAILWAY
COMPANY.

*New Castle, Aug.* 8, 1911.   ·

Where a mortgage upon the property of a railroad company was fore-
closed by action, and it was not contended that the descriptive clause of
the mortgage did not cover freight cars, and the decree of foreclosure
included rolling stock, that decree precluded receivers of the mortgagor
company from contending later that freight cars were not covered by the
mortgage.

To secure an issue of bonds a corporation may include in a mortgage
upon its railway, rights and franchises, property that was clearly personal
in its character, though the mortgage does not comply with the require-
ments of a chattel mortgage.

The general corporation law (22 *Del. Laws, c.* 392) § 123, authorizes the
consolidation of railroad companies; and *section* 60 provides that when
the agreement required by *section* 59 is signed and filed the separate exis-
tence of the constituent corporations shall cease, and the consolidated cor-
poration shall become a single corporation, with all the rights, powers and
privileges of the constituent companies, providing that all rights of credi-
tors and liens upon the property of the original companies shall remain
unimpaired, and all their debts, liabilities and duties shall attach to the
consolidated corporation.  The entire property, including the rolling stock,
of one of the constituent companies of a consolidated railroad was mort-
gaged, and the mortgage also provided that equipment, replacing old and
useless equipment, should be subject to its lien.  *Held*, that a car pur-
chased to replace one owned by the constituent company was subject to
the lien of the mortgage, even though purchased by the receiver of the
consolidated company, and with its funds.         ₒ

A mortgage upon the rolling stock of a railroad provided that new
equipment purchased to replace that which was worn out and unfit for
use should be subject to the mortgage.  A receiver having been appointed,
he petitioned for permission to purchase a new freight car, alleging that
the one now in use could not be repaired so as to be safe, and that it was
entirely worn out.  *Held*, that a car so purchased was subject to the lien
of the mortgage, even though the old freight car was repaired and again
used.

Where both of the constituent companies of a consolidated railway corporation had given mortgages, including their after acquired rolling stock, and the consolidated company purchased equipment to replace the rolling stock of the first constituent company, the mortgage of the first company was a prior lien on the purchased property over that of the second.

PETITION OF RECEIVERS FOR INSTRUCTIONS AS TO DISPOSITION OF CERTAIN PROPERTY. On August 1st, 1896, the Wilmington and New Castle Electric Railway Company, under authority of the Act of the Legislature by which it was incorporated, mortgaged its railway, equipment, corporate rights and franchises to secure bonds issued in order to construct its railway. On April 2nd, 1904, the company was merged and consolidated with the New Castle and Delaware City Railway Company into the Wilmington, New Castle and Southern Railway Company. On May 23rd, 1907, receivers were appointed for the last named company, and during their administration of its affairs, pursuant to an order of the then Chancellor, purchased a freight car to replace one owned by the Wilmington and New Castle Electric Railway Company at the time of the merger.

In accordance with the opinion of the Chief Justice sitting as Chancellor, [*ante p*. 99] the Chancellor being disqualified to hear the cause, the mortgaged property was sold under a decree of foreclosure and the receivers filed this petition for instructions as to what disposition should be made of certain property, and more especially of the freight car above mentioned.

*Saulsbury, Ponder & Morris* and *Robert H. Richards*, for the receivers.

*Daniel O. Hastings*, for the purchaser under foreclosure proceedings.

THE CHIEF JUSTICE: This case is before the Court upon an agreed statement of facts, which will sufficiently appear in the following opinion. The important question to be determined, is whether a certain freight car which was bought by the receivers of the Wilmington, New Castle and Southern Railway Company was covered by the lien of a mortgage exe-

cutcd by the Wilmington and New Castle Electric Railway Company dated August 1st, 1896 and recently foreclosed by the order of this Court. In 1904, and several years subsequent to the execution of said mortgage, the said Wilmington and New Castle Electric Railway Company and the New Castle and Delaware City Railway Company, by agreement, and under the laws of this State, merged and consolidated into the Wilmington, New Castle and Southern Railway Company. It is not denied that the descriptive language of said mortgage is sufficient to cover a railway car, but it is strongly argued by counsel for the receivers that there was no authority given by any law of this State for including said car, which they claimed to be personal property, in a mortgage which was essentially a real estate mortgage.

The company that executed the mortgage was created by a special Act which was enacted some three years before the passage of the general corporation law (22 *Del. Laws, c.* 392) of this State. This special Act (19 *Del. Laws, c.* 707) provided, " * * * that the said company, for the purpose of building and equipping the railway, shall have the power to borrow money, if the Board of Directors shall so determine, to an amount not exceeding the sum of $150,000, and to secure the payment of the same by the issue of bonds, or of the bond and mortgage of said railway, together with the corporate rights and franchises granted by this Act." *Section 2.*

It is contended that the authority to mortgage the railway, corporate rights and franchises did not include the right to mortgage rolling stock or any personal property of the company. Although the argument made in support of this proposition is interesting, I do not think it should be considered at this stage of the protracted litigation connected with the mortgage. The question was not raised at any of the arguments made in resisting the foreclosure of the mortgage, and after a most vigorous and able opposition to said foreclosure, on other grounds, a decree was finally made in pursuance of which the property described in the mortgage, including cars, was sold at public sale and purchased by Solomon Hanford, who is now claiming the car in question. No objection was made, at any

time, by the receivers, or any one else, to the sale of the cars, and no objection is made now to the sale of any car other than the one in controversy. Moreover, in a petition filed by the receivers subsequent to the sale, for the purpose of definitely ascertaining whether certain property sold under the foreclosure decree belonged to the purchaser at the sale, it was stated:

"In the opinion of these receivers all the property set forth in 'Schedule A' is covered by the descriptive language of said decree and of the mortgage so as aforesaid foreclosed by said decree. In the opinion of these receivers the property mentioned and set forth in 'Schedule B' is not covered by the descriptive language of said decree or of the mortgage foreclosed thereby. In order that these receivers may be protected in their action in the premises, they respectfully pray your Honor to make an order directing such disposition by them of the property mentioned in 'Schedule A' and 'Schedule B' respectively, as shall seem proper and equitable under the circumstances."

Accordingly a decree was made authorizing and directing the receivers to deliver unto Solomon Hanford, the purchaser, absolutely and unconditionally, all the property mentioned in "Schedule A" attached to the petition; and further authorizing and directing the receivers to deliver unto the said Hanford possession of the property mentioned in "Schedule B," to be held, kept, maintained and cared for by the said Hanford subject to the further order of the Court as to the final disposition thereof, and subject to such further order as the Court should make touching the question as to whether all or any part of said property mentioned in "Schedule B" is covered by the terms of the said decree of foreclosure and by the descriptive language and terms of the said mortgage so as aforesaid foreclosed by said decree. Among the property mentioned in "Schedule A" is included several cars, and other rolling stock, as well as numerous articles which are clearly personal property that belonged to the Wilmington and New Castle Electric Railway Company before the merger. Included in "Schedule B" is the car in question, and other articles which are clearly personal property, that were acquired at various times between

the organization of the Wilmngton and New Castle Electric
Railway Company and the appointment of the receivers for
the Wilmington, New Castle and Southern Railway Company.
For this Court to sustain the contention of the receivers that
the Wilmington and New Castle Electric Railway Company
had no authority in law to include cars in its mortgage would
be, in effect, to hold that its decree of foreclosure was erroneous
and void so far as the rolling stock was concerned.   Such a
ruling would be entirely inconsistent with said decree and the
sale made thereunder.

The second contention made by the receivers, is that in
this State, at the time of the execution of the mortgage, there
was no law authorizing the mortgaging of personal property
except the chattel mortgage statute, and that the mortgage in
question was to all intents and purposes a real estate mortgage,
and was not executed and recorded in conformity with said
statute.   The Legislature of this State on February 17th, 1897,
enacted a supplement to the chattel mortgage law (*Chapter* 579,
*Vol.* 20, *Laws of Delaware, Vol.* 15, *Laws of Delaware, c.* 477)
by adding thereto the following words:

"Provided, that none of the provisions of this Act shall be applica-
ble to mortgages  or deeds  of trust including  both real and  personal
property, heretofore or hereafter executed  by any  corporation to secure
an issue of bonds."

Without undertaking to decide what was the effect of such
supplementary Act upon the mortgage under consideration, its
intent and purpose was manifestly to remove any doubt that
may have existed respecting the lien of such mortgages upon
the personal property included therein.   And that Act is also
significant and pertinent in that it clearly recognizes the fact
that such mortgages embraced personal as well as real property.
It does seem to have been passed to cover just such cases as
this, if not this particular case; and it was certainly the inten-
tion of the Legislature, in its enactment, to recognize the power
of a corporation to include in a mortgage upon its railway,
rights and franchises, property that was clearly personal in its
character.   But without regard to this Act, I would repeat here
what I have said relative to the first contention made by the

receivers. The objection that the mortgage does not conform to the chattel mortgage law, and constitutes, therefore, no lien upon the car in question, could have been as well made to any cars or personal property described in the mortgage and sold without objection, under the decree of the Court. When the Court made the foreclosure decree, and directed that all the property described in the mortgage should be sold, it necessarily decided that such property was bound by the lien of the mortgage, which would not have been the case if the company that executed the mortgage had no right or authority to include therein its rolling stock. I, therefore, consider that I have already passed upon the first and second questions raised by the receivers.

But while I do not, for the reasons stated, think it necessary or proper to consider the interesting and able arguments made by counsel in support of the receivers' first and second contentions, I do not want to be understood as recognizing the soundness of such contentions. While the authorities appear to be conflicting upon these points, there are many that hold that the rolling stock of a railroad or railway company is not personal property in the ordinary or common law sense, but rather in the nature of fixtures, which are bound by a mortgage upon the railway, rights and franchises of the company. And there are other very strong authorities which take the position that the cars of the company, and whatever else is essential to the operation of the road are necessary incidents and appendages of the railway, and are lawfully covered by a mortgage thereon. *Randolph v. Wilmington & Reading R. R. Co.*, 20 *Fed. Cas.* 264; *Pullan v. Cin. & C. Air Line R. R. Co.*, 20 *Fed Cas.* 32; *Hamlin v. Jerrad, 72 Me.* 62. I desire to make special reference to the case of *Hamlin v. Jerrard* in this connection. It is also noticed later in this opinion in respect to another point. In the course of a well considered opinion the Court in that case said:

"But all the rolling stock to be acquired, as well as materials and equipments for constructing, maintaining, operating, repairing and replacing the road and its appurtenances, or any part thereof, are within the specific statement of property mortgaged. If the engines and cars are not

fixtures, they are so connected with the railroad, and so indispensable to its operation, that there is a clear distinction between them and other kinds of personal property. They may well be held to be exceptions to the general rule that property not *in esse* cannot be conveyed. We do not mean to intimate that rolling stock to be subsequently acquired could be mortgaged without the railroad. But when the railroad itself is mortgaged with the franchise, the rolling stock to be acquired for the purpose of completing or repairing it is so appurtenant to it, that the company have a present, existing interest in it sufficient to uphold the grant of both together, the one as incident to the other. Their title to the railroad is the foundation of an interest in the cars and engines to be acquired for its use. We think that such property as this, of a class specially mentioned in the mortgage, acquired for lawful railroad purposes, on hand for present use, or to meet expected requirements, is held by the mortgagors subject in equity to the mortgage from the time their title and possession accrued, and that when the trustees become actually possessed of it under the mortgage, they may hold such possession at law against the attacking creditors of the corporation."

The following cases were cited by counsel for the receivers, and some of them seem to sustain their contention: *Miller v. Rutland, etc., R. R. Co.*, 36 *Vt.* 452; *Williamson v. R. R. Co.*, 29 *N. J. Eq.* 311; *State Treasurer v. Sommerville, etc., R. R. Co.*, 28 *N. J. L.* 21; *Hoyle v. Plattsburgh, etc., R. R. Co.*, 54 *N. Y.* 314; *Howe v. Freeman*, 14 *Gray (Mass.)* 566; *Coe v. Columbus, etc., R. R. Co.*, 10 *Ohio St.* 372; *Railroad Co. v. Gillmore*, 37 *N. H.* 410; *Railroad Co. v. Ft. Howard*, 21 *Wis.* 45.

The third and last point made by the receivers, and upon which I assume they mainly rely, is, that even if under the charter of the Wilmington and New Castle Electric Railway Company, and the existing laws of the State at the time of the execution of its mortgage, it were possible that the mortgage could be a lien upon rolling stock, it could not be a lien upon the car in question although the mortgage does, by its terms, embrace cars and other rolling stock of the company; and although the descriptive language of the mortgage includes also property "which may hereafter belong to said company"; and *Article* 4 of the mortgage provides "that the said Railway Company shall also have full power from time to time to dispose of, according to its discretion, such portion of its equipment, machinery and implements at any time held or acquired for the use of said Company as may have become unnecessary

and unfit for such use, replacing the same by new which shall then become subject to the lien of this mortgage."

It is argued first, that *Article* 4 does not apply to the facts of the present case because there was no actual disposition of the car which it is alleged by the purchaser the car in question was bought to replace.   It is insisted that the old car was not worn out or unfit for use, but that it was remodeled and in use when the road was turned over to the purchaser.   In the second place, it is contended, and this is obviously the important point in the case, that the mortgage, under the after acquired property clause, cannot by any construction be held to cover any after acquired property other than property after acquired by the Wilmington and New Castle Electric Railway Company, the mortgagor.   That it could not, therefore, cover the car in dispute which was purchased by the receivers of the Wilmington, New Castle and Southern Railway Company, a corporation created by the consolidation of the Wilmington and New Castle Electric Railway Company and the New Castle and Delaware City Railway Company under the general corporation law of this State.   The broad contention of the receivers in this connection, is "that when there is a merger of several corporations into one corporation, under such a statute as ours, and the consolidated corporation thereafter acquires rolling stock, which may by the terminology of the mortgages upon the component constituent corporations, be sufficiently included, and which constituent corporations have included in their mortgages after acquired property clauses, that those clauses do not cover, and the mortgage cannot be a lien upon rolling stock subsequently acquired by the consolidated corporation."   In support of this contention the following authorities were cited, viz.: *Security & Trust Co. v. Louisville R. R. Co. (C. C.)* 102 *Fed.* 382; *Hinchman v. Port Defiance Ry. Co., et al.*, 14 *Wash.* 349, 44 *Pac.* 867, 872; *Pullman's Palace Car Co. v. Mo. Pac. Ry. Co.*, 115 *U. S.* 587; *Chicago, etc., Ry. Co. v. Kansas City, etc., R. R. Co. (C. C.)* 38 *Fed.* 58.

It is claimed that the first mentioned case (102 *Fed.*) is particularly in point, and on all fours with the present one.   The

following words taken from the very long opinion delivered by the Court seem to warrant such claim:

"The after acquired property clause in each of the mortgages can rightly be construed, I think, to extend only to property subsequently acquired by the mortgagor. The consolidated company is a new and different organization."

The court then say:

"The case of *Hinchman v. Railway Co.* is quite in point, and in principle the question seems to be covered by the decision in *Pullman's Palace Car Co. v. Missouri Pac. Ry. Co.*"

It is not clear why the Court used the language I have quoted, because it does not seem that it was necessary or pertinent to the decision of the case. The facts are very complicated, and the opinion exceedingly long, and it may be that I have not, from my reading of the case, fully comprehended the points involved. But I have been not able to find that the exact question now before me was involved in that case. Even though I should be mistaken in this, it is quite certain that the *Hinchman Case* which was considered "quite in point," is not so in the present case. Neither is the question which the Court said was covered in the *Pullman Palace Car Case* the same as the one involved here.

In the *Hinchman case* the Court said:

"That no part of the money secured by the mortgage was loaned upon the faith or the credit of the property so afterwards acquired, is apparent. * * * Nor can it be said that it was purchased by the new company to replace the former equipment of the line covered by the respondent's mortgage."

It is contended, I know, that the car in question does not fall within the provisions of the mortgage which I have quoted from *Article* 4, because it appears from the agreed statement of facts that the car which it is alleged to have been bought to replace as worn out and unfit for use, was in fact repaired, remodeled and continued in use, and was not replaced by the new car. But it also appears from the said statement of facts that the receivers presented to this Court a petition dated

August 19th, 1909, relative to the purchase of the new car, which recited, among others, the following facts:

"That the said freight car has been in continuous use, excepting at times when it needed to be repaired, by the receivers throughout the whole operation of the road by them until a few weeks ago, when it became so thoroughly out of repair, worn out, defective and useless as that it was impossible to be used by these petitioners in the operation of the said road, or to be repaired and put in such condition as that its further use would be practicable. These receivers have had the old freight car thoroughly examined with the view of repairing it, if possible, but the result of such examination, both by themselves and by mechanics, is conclusive of the fact that it is impossible to repair the old car so that it can be safely used. * * * These petitioners further represent that it is necessary that they purchase such a new freight car to enable them adequately to operate the road and attend to the freight business which comes to the road, and, in the opinion of these petitioners, a failure to purchase such a new car, or otherwise provide said road with such adequate equipment, would be greatly to the detriment of the road and would detract from its value as a going concern, inasmuch as it would lose to the road the very valuable freight business which it now has."

It would be difficult to imagine facts or conditions which would show that a new car was more necessary, or that the old car was more worthless, unnecessary and unfit for use. Upon the representations made in said petition the Court authorized the receivers to purchase the new car, which is now in dispute, and the order was made upon the assumption that the old car was useless for the purpose for which it was acquired and used, and that there was an actual and pressing need for a new car to replace the old one. There can be no question that the new car was obtained to replace one that had become unnecessary and unfit for use, and it does, therefore, come within *Article* 4 of the mortgage. But whether or not this after acquired property was bound by the lien of the original mortgage must depend upon the intention of the parties, the statute and agreement under which the merger or consolidation was was effected, and other existing laws of the State. Inasmuch as the mortgage provided that the company should have power at any time to dispose of any part of its equipment that was unfit for use, and replace the same by new, which should become subject to the lien of the mortgage, it is manifest that it was the

intention of the parties that any new car which was acquired to replace an old one should be bound by the lien of the mortgage. This fact, together with the further fact, that the new car was authorized to be bought to replace one that was unfit for use, clearly distinguishes this case from the *Hinchman case*, upon which the receivers, and the Court in the 102 *Fed.* case, so much relied. In the *Hinchman case*, it will be remembered, the Court said:

"Nor can it be said that it  the property in question) was purchased by the new company to replace the former equipment of the line covered by the respondent's mortgage."

*Section* 123 of the general corporation law of this State authorizes the consolidation of railway companies, and provides that the consolidated corporation shall "be possessed of, exercise and enjoy all the franchises, rights, powers, privileges, immunities and benefits which any corporation of this State, constituent thereof, was possessed of or entitled to exercise, under its charter or any law of this State; and shall be subject, within this State, to the conditions and restrictions imposed by its charter, or any corporation of this State, constituent thereof."

*Section* 59 provides that the directors of the consolidating companies may enter into an agreement prescribing the terms and conditions of consolidation, the mode of carrying the same into effect, etc.

*Section* 60 is the most important and pertinent part of said Act, so far as the present inquiry is concerned, and it is in the following language:

"When the agreement is signed, acknowledged, filed and recorded, as in the preceding section is required, the separate existence of the constituent corporations shall cease, and the consolidated corporations shall become a single corporation in accordance with the said agreement possessing all the rights, privileges, powers and franchises, as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so consolidated, and all and singular the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due on whatever account, as well for stock subscriptions as all other things in

action or belonging to each of such corporations shall be vested in the consolidated corporation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the consolidated corporation as they were of the several and respective former corporations;   *   *   *   provided, that all rights of creditors and all liens upon the property of either of said former corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective former corporations shall thenceforth attach to said consolidated corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it."

In determining the right of each consolidated company after consolidation, the merger agreement and the Act under whose authority the consolidation was effected must be especially considered. The part of the Act most material to the present question is the provision, "that all rights of creditors, and all liens upon the property of either of said former corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective former corporations shall thenceforth attach to said consolidated corporation". In the agreement of consolidation and merger is found substantially the same provision, viz.: "And all the rights of creditors, and all liens upon the property of either of said corporations, parties hereto, shall be preserved unimpaired; and the said corporations, parties hereto, may be deemed to continue in existence to preserve the same," etc.

In that part of the mortgage which described the property bound thereby is the following language:

"Together with all the rolling stock, tools, machinery, implements and materials now belonging, or which may hereafter belong to said Railway Company, and now or hereafter in use, or intended for use upon said railways or property," etc.

Under the foreclosure decree the property was advertised and sold as described in the mortgage. It cannot be denied that the language of the mortgage, which I have quoted, would be sufficient to cover the car in question if it had been acquired by the Wilmington and New Castle Electric Railway Company after the execution of the mortgage. In other words, it is clearly sufficient in its terms to cover after acquired property. It is equally clear, I think, that it was the intention of the parties

to the mortgage that any property acquired at any time to replace that which had become unnecessary and unfit for use should be bound by the lien of the mortgage. It is not denied that after acquired property may be bound by the lien of a mortgage executed before the acquisition of said property, but it is claimed that the car in question is not so bound because it was acquired by the receivers of the consolidated company. I have already referred to the leading cases cited by counsel for the receivers, and relied upon to sustain their position. The following cases were cited by counsel for the purchaser: *Hamlin v. Jerrard,* 72 *Me.* 62; *Wabash, St. L. & Pac. R. R. Co. v. Ham,* 114 *U. S.* 587; *Tysen v. Wabash Ry. Co.,* 15 *Fed.* 763; *Strang v. Montgomery & E. R. Co.,* 23 *Fed. Cas.* 218, 3 *Woods* 613.

I wish to refer again to the case of *Hamlin v. Jerrard,* because it seems to me to contain not only a very thorough and able treatment and discussion of the subject under consideration, but also to be more in point than any other case that has been cited on either side. The Court in delivering their opinion said:

"It would be an important question, if it were directly presented, whether the net income of the property of the Maine company, so far as it became invested in property such as is described in that mortgage, even if the investment were made by a new corporation that had acquired the right to run the road, could ever rightfully be diverted from its legitimate use in lending additional security to the first mortgage bondholders. It is clear that all accessions to the road and its appurtenances in Maine, after consolidation as before, were accessions to a mortgaged estate, and subject first to the mortgage that has priority of date. If the consolidated company increased the value of mortgaged property by the avails of a later mortgage, such mortgage must be postponed to the earlier one on each part, just as if each company separately had put a second mortgage on its own line of road. The consolidated company assumed the debts of its several parts, and recognized the prior liens upon them. It assumed also, by force of law, the burden of having any increased value of the road and its appurtenances, go as security, first, for those prior liens. It cannot claim that its duty was merely to keep them in *statu quo* in as good condition as when received and that as against the first morrgagees additions and improvements belong to itself as a distinct entity. If such a claim were sustained the very income of the property of the Maine road might go to swell its value. and the clauses conveying future acquisitions become void of effect; although the newly acquired property made part

of the value of the road itself.    The first mortgage on the Maine road, and the first mortgage on the New Brunswick road, remain the first liens on all acquisitions of the consolidated company, which issue from and become part of the estate to which those mortgages applied.    A due regard for vested interests imperatively demands such a legal conclusion and effect.    To reach this result if the original companies have ceased to exist or to be capable of organization and action the consolidated company, notwithstanding the articles of union declare it one, must still be regarded, to save the rights of prior creditors, as two, one in Maine, and one in New Brunswick, having the same name and officers, and each representing the original company to whose rights and liabilities it succeeded; with which it has a unity of interest and of obligation.    There can be no loss of identity of the orignal companies in the consolidation, to the prejudice of the rights of prior creditors, or to the destruction of prior liens.    See *Central Railroad & Banking Co. v. Georgia*, 92 *U. S.* 665."

The reasoning of the Court in that case impresses me as being sound in principle, and entirely consistent with the intention and rights of the parties to the mortgage.    I, therefore, hold in the present case, that although the car in dispute was purchased by the receivers of the consolidated company, it was nevertheless, after its acquisition, subject to the lien of the mortgage of the Wilmington and New Castle Electric Railway Company, and passed to the purchaser at the sale made under the foreclosure decree.

It was suggested at the argument that if the car purchased by the receivers was covered by the mortgage of the Wilmington and New Castle Electric Railway Company, it was ust as clearly covered by similar language employed in the mortgage of the New Castle and Delaware City Railway Company, and the mortgage of the consolidated company.    In reply to such suggestion it may be said that the old car, which the new car was bought to replace, was never owned by the New Castle and Delaware City Railway Company at all; and as the mortgage of the Wilmington and New Castle Electric Railway Company constituted, in my opinion, a lien upon the new car, as after acquired property, the other two mortgages were necessarily junior liens and subordinate to the original mortgage, even if their descriptive clauses were sufficient to include said car.    It is an undisputed fact that all the rolling stock held by the consolidated corporation, or the receivers thereof, except

the one car purchased by the receivers, was, before the consolidation, purchased, owned and used by the Wilmington and New Castle Electric Railway Company; and it is undisputed that the New Castle and Delaware City Railway Company never owned any rolling stock at all. The thought of the receivers seems to be, that because the new car was purchased by them from the income of the consolidated road it could not be a part of the mortgaged property. Upon this point I desire to quote briefly from the opinion delivered by the Court in *Strang v. Montgomery & E. R. Co.*, 3 *Woods* 613, 617, 618, 619, viz.:

"The next question to be settled is, did the cars and other rolling stock purchased by the receiver from the income of the road, pass, by the sale, to the purchaser? The mortgage which was foreclosed in this case covered not only the railroad and other real property, but also the cars, engines and other rolling stock, and all descriptions of personal property owned by the railroad company, or to be thereafter acquired. The road and its equipment constituted the complete and entire thing which was covered by the mortgage. The road, on the one hand, and the equipment on the other, were useless unless held and used together. One of the purposes to be accomplished in the appointment of a receiver, was the preservation of the mortgaged property. This could only be done by repairing the track, and replacing the engines and cars when required. Money expended for either of these purposes becomes incorporated into the *corpus* of the mortgaged property. * * * The claim of the petitioners is, that after the road passed into the hands of the receiver, all its income and profits became their property by an absolute title, and, therefore that the engines, and other property purchased with such income and profits, vests in them and do not become part of the mortgaged property. * * *

"There is no consideration which would justify the Court in holding that the purchasers of the mortgaged property have not acquired title to the rolling stock bought by the receiver. It was as much a part of the mortgaged property as the iron rails put on the track by him."

In accordance with the foregoing opinion the following order was entered:

"And Now, to wit, this eighth day of August, A. D. 1911, argument upon the foregoing agreed statement of facts having been heard and carefully considered by the Chief Justice, and the Chief Justice being of the opinion that the new freight car mentioned in Schedule B filed and attached to the order made by the Chief Justice on the twenty-sixth day of January, 1911, is covered by the lien of the mortgage given by the Wilmington

and New Castle Electric Railway Company and that the title to the same passed to the purchaser, Solomon Hanford, under the foreclosure sale, and the said new freight car having been held by the said Solomon Hanford subject to the further order of this Court.

"It is ordered by the Chief Justice (the Chancellor being disqualified to sit in this cause), that Wilmer Palmer and Joseph Chester Gibson, Receivers of the Wilmington, New Castle and Southern Railway Company, be and they are hereby authorized and directed to deliver unto Solomon Hanford, or his assigns, absolutely and unconditionally, the new freight car mentioned in Schedule B, as aforesaid."

The ownership of the freight car being the principal contention, the balance of the property contained in Schedule B was, by consent of counsel, ordered delivered to the said purchaser, absolutely and unconditionally.